# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SARAH DONOVAN, JODY HIRST, NICK KIEFFER, MATT NATCHWAY, and GAIL VYEDA, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>EMPOWER FINANCE, INC.,<br><br>　　　　Defendant. | No.  3:24-cv-27<br><br>**CLASS ACTION** |

## CLASS ACTION COMPLAINT

Plaintiffs Sarah Donovan, Jody Hirst, Nick Kieffer, Matt Natchway, and Gail Vyeda ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Empower Finance, Inc. ("Defendant" or "Empower"), and allege as follows:

## NATURE OF THE ACTION

1.　　This action concerns a cash advance product that Defendant offers in Pennsylvania.

2.　　To obtain compensation for offering this product, Defendant charges fees and tips.

3.　　These charges yield triple digit APRs that routinely exceed 300%.

4.　　That is far above the lawful rate allowed in Pennsylvania.

5.　　Accordingly, Plaintiffs bring this action, on behalf of themselves and a class of all similarly situated persons, under the Pennsylvania Loan Interest and Protection Law ("LIPL"), the Pennsylvania Consumer Discount Company Act ("CDCA"), the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), the Truth in Lending Act ("TILA"), and the Electronic Funds Transfer Act ("EFTA") and Plaintiffs seek to recover all overcharges paid to Defendant, statutory damages, and attorneys' fees and costs.

1

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d).

7. The Court has personal jurisdiction over Defendant because Plaintiffs' claims arose in this district and Defendant does substantial business in this district.

8. Venue is proper under 28 U.S.C. § 1391.

## PARTIES

9. Sarah Donovan is a person residing in Blair County, Pennsylvania.

10. Jody Hirst is a person residing in Allegheny County, Pennsylvania.

11. Nick Kieffer is a person residing in Carbon County, Pennsylvania.

12. Matt Nacthway is a person residing in Snyder County, Pennsylvania.

13. Gail Vyeda is a person residing in Cambria County, Pennsylvania.

14. Empower is a technology company headquartered in San Francisco, California.

15. Empower is not a bank and is not licensed under any Pennsylvania statute.

16. Empower makes loans or advances to Pennsylvania consumers over the internet.

## FACTUAL ALLEGATIONS

*Empower's Cash Advance Product*

17. Empower operates a lending app called "Empower."

18. The app provides consumers with cash advances.

19. The app allows users to obtain advances of up to $250.00.

20. Users must connect a bank account or a payment card to obtain an advance.

21. After doing so, Empower analyzes its users' bank account history using proprietary underwriting criteria to determine whether a user is eligible for an advance and the amount of an advance that a user is eligible to obtain.

22. In practice, these criteria prevent consumers from obtaining an advance unless they have a recurring source of income directly deposited into their linked bank account.

23. Empower's proprietary underwriting criteria also limits most users to amounts that are far below the $250.00 advertised maximum advance amount.

24. Empower currently offers a standard advance and an expedited advance.

25. The former is deposited into a bank account a few days after it is requested.

26. The latter is deposited into a bank account a few minutes after it is requested.

27. Users must pay an express fee to obtain an expedited advance.

28. That fee ranges from $1.00 to $8.00.[1]

29. Users also must pay a $8.00 monthly subscription fee to obtain any type of advance, whether standard or expedited.

30. These "fees" are intended to compensate Empower for lending money; they do not cover the cost of providing other services.

31. On top of these "fees," before users can obtain an advance, they must proceed past a screen that has selected a default "tip."

32. The screen does not disclose that consumers may avoid tips.

33. Instead, consumers must figure out how to do so on their own to avoid paying a tip when obtaining a cash advance.

34. Unlike Uber or DoorDash, Empower's "tips" do not go to a delivery driver that is trying to make ends meet; instead, Empower's tips provide a profit center for a publicly traded

---

[1] It costs: $1.00 for a $10.00 advance; $2.00 for an advance of $10.01-$49.99; $3.00 for an advance of $50.00-$74.99; $4.00 for an advance of $75.00-$99.99; $5.00 for an advance of $100.00-$149.99; $6.00 for an advance of $150.00-$199.99; $7.00 for an advance of $200.00-$249.99; and $8.00 for a $250.00 advance.

3

company that already is backed by venture capitalists and highly experienced investors. Melia Russell, *Former Sequoia Investor Warren Hogarth left his job and went on to raise $150 million to build Empower, a startup that advances case to people with poor credit*, BUSINESS INSIDER, (Sept. 6, 2022), https://www.businessinsider.com/sequoia-vc-warren-hogarth-raises-funding-for-fintech-startup-empower-2022-8.

35. Indeed, Empower's "tips," just like Empower's "fees" are intended to compensate Empower for loaning money.

36. Empower's cash advances are repayable on a consumer's next payday.

37. To ensure that it gets repaid, Empower requires its users to authorize Empower to automatically deduct its advances from the user's bank account or payment card immediately after their employer deposits a paycheck into their bank account on payday.

38. The "fees" and "tips" associated with Empower's cash advances are incorporated into a user's repayment obligation, and users must authorize Empower to automatically deduct its advances, with any "fees" and "tips," immediately after a user's employer deposits a paycheck into their bank account on payday.

39. Empower will not issue cash advances unless Empower believes that it will be able to automatically deduct its advances, and any "tips" or "fees," from a consumer's bank account immediately after their employer deposits a paycheck on payday.

40. Empower's underwriting criteria, the requirement that borrowers link their bank accounts or payment cards to the Empower app, and Empower's requirement that users authorize Empower to deduct its advances, tips, and fees from bank accounts on payday, has resulted in Empower obtaining repayment on the vast majority of the advances that Empower issues to users located in Pennsylvania.

4

41. On the off-chance that Empower fails to obtain repayment, Empower will not issue another cash advance until Empower is able to debit the prior advance and any fees or tips.

42. By requiring users to repay its advances, and by requiring users to allow Empower to automatically debit accounts for repayment, Empower can cause consumers to incur overdraft fees, or insufficient fund fees, if a bank account does not have sufficient funds to repay Empower's automatic account debits.

***Empower's Cash Advance Product Is Costly***

43. Empower advertises its cash advance product as no interest or 0% interest product.

44. This claim is untrue—Empower's cash advances have significant costs.

45. For example, a $50.00 cash advance, with a two-week repayment schedule, a $4.00 express fee, and an $8.00 monthly fee yields a 625.71% APR.

46. The same advance with a $5.00 tip yields an 886.43% APR.

47. Empower does not disclose the APRs of its cash advances before, during, or after any transaction, which allows Empower to mislead borrowers to believe its advances have no cost.

48. The APRs associated these cash advances are similar to the APRs associated with payday loans. *See* California Department of Financial Protection and Innovation, *Initial Statement of Reasons for the Proposed Adoption of Regulations*, p. 62 (Mar. 15, 2023), *available at*, https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2 (stating the "APRs for companies [offering advances through cash advances apps] are generally similar to the average APRs for licensed payday lenders in California"); Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (July 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-advanc e-apps-like-earnin-dailypay (displaying the cost of payday loans versus cash advances); Grace Gedye, *The new payday loans?*

*California moves to regulate cash advance apps*, Cal Matters (June 5, 2023), https://calmatters.org/economy/2023/06/earned-wage-access/ (similar).

49. The high fees associated with payday loans generally leave holes in the paychecks of borrowers, which leads to a cycle of reborrowing, where borrowers take out new loans to fill the gaps created by old loans. *See, e.g.*, Consumer Financial Protection Bureau, *Payday Loans and Deposit Advances Products*, pp. 21-22 (Apr. 24, 2013), *available at*, https://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf (finding only 13% of borrowers took 2 or less payday loans in a two month period).

50. Cash advances apps, including Empower, create these same holes and reborrowing cycles. *See, e.g.*, Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (July 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-advance-apps-like-earnin-dailypay; (detailing cash advance app user, who "found himself trapped in a constant loop or borrowing" and felt he had "completely lost control of the situation, with no way to work it out"); Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071 (detailing cash advance app user who described the app as a "vicious cycle" and "had no money" after paying tips and fees); Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/archive/2019/12/online-banking-lending-earnin-tip/603304/ (detailing cash advance app user who fell into a "cycle of get paid and borrow, get paid and borrow").

51. Despite Empower's cash advances being just as costly as payday loans, Empower obtains repayment of its advances, along with fees that yield triple digit APRs and are intended to

provide Empower compensation for lending money, at a rate of at least 97%. *See* Financial Health Network, Earned Wage Access and Direct-to-Consumer Advance Usage Trends, p. 2 (April 2021), *available at*, https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_ Trends_FINAL.pdf.

52. This rate "significantly" exceeds that of payday lenders. *See* California Department of Financial Protection and Innovation, *Initial Statement of Reasons for the Proposed Adoption of Regulations*, pp 24-25 (Mar. 15, 2023), *available at*, https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2

53. Despite receiving amounts that are just as costly as those charged for a payday loan, and despite receiving those costly charges on virtually every cash advance that it issues, Empower, unlike payday lenders, never discloses the cost of its advances in terms of APR.

54. This results in borrowers failing to understand the true cost of Empower's advances. *See, e.g.,* Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-tak ing-n1034071 (discussing user unaware that cash advance app had triple digit APRs); Laurence Dermiento, *His app lends money for free. But it will probably cost you*, LA Times (May 18, 2022), https://www.latimes.com/business/story/2022-05-18/dave-inc-jason-wilk-cash-advance-app (same).

***Empower's Lending Practices Harm Pennsylvania Consumers***

55. Empower's advances are no different than payday loans.

56. Payday loans generally are "balloon" loans, which means the principal a consumer receives, along with any fee or other amount a consumer is scheduled to pay, are repaid in a single installment, generally on payday.

57. The compensation payday lenders receive for making loans generally reaches triple digits in terms of APR.

58. As explained above, Empower's advances function as "balloon" loans as well, and Empower similarly receives costly compensation for making advances.

59. Empower's cash advances, however, are worse than payday loans in at least two respects.

60. First, unlike payday lenders, Empower deceptively brands its cash advances as "no interest" or "0% interest," and fails to inform consumers about the cost of its advances in terms of APR, which prevents consumers from understanding what they are paying.

61. This also takes advantage of the general public's lack of awareness of how fees can add up.

62. Both of these things can result in a detrimental cycle of debt, and incentivize poor money management habits.

63. Second, unlike payday lenders, Empower is more successful in taking its triple digit APR compensation from borrower's bank accounts, and Empower does so at a rate of at least 97%. *See* Financial Health Network, Earned Wage Access and Direct-to-Consumer Advance Usage Trends, p. 2 (April 2021), *available at*, https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-sage_Trends_FINAL.pdf.

64. That means users of Empower's cash advance product are far more likely to have amounts that yield triple digit APRs deducted from their bank accounts than borrowers that visit traditional payday lenders.

65. By taking tips and fees that yield triple digit APRs from user's accounts with a 97% success rate, and by failing to disclose the cost of its cash advances with a recognizable metric—

like APR—Empower is trapping Pennsylvanian's in a detrimental "cycle of get paid and borrow, get paid and borrow." Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/archive/2019/12/online-banking-lending-earnin-tip/603304/.

*Empower's Lending Practices Are Unlawful*

66. The Commonwealth of Pennsylvania "has a long history, dating back to colonial times, of outlawing annual interest rates above 6%." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 329 (3d Cir. 2022).

67. Today, that history is codified in the LIPL, which sets the maximum rate of interest at 6% for the loan or use of money. 41 P.S. § 201(a).

68. The CDCA provides an exception, and allows those licensed under the CDCA to charge, collect, contract for, and receive interest and fees that yield APRs between 24% and 29% (depending on the term and size of the loan and the interest, fees, or other amounts licensed lenders impose or receive). 7 P.S. §§ 6213, 6217.1.

69. At the same time, the CDCA prohibits unlicensed persons that make or negotiate loans or advances of money or credit from charging, collecting, contracting for, or receiving any interest, fees, or other amounts that, in the aggregate, exceed 6%. 7 P.S. § 6203.A; *see also Lutz*, 49 F.4th at 329 (citing 7 P.S. § 6203.A and 41 P.S. § 201(a)).

70. Empower is not a CDCA licensee, which means it cannot charge, collect, contract for, or receive interest, fees, or other amounts that exceed 6%, yet Empower does just that.

71. And even if Empower held a CDCA license, its cash advances would still be illegal because all of Empower's cash advances have triple digit APRs, which far exceed the 24% to 29% APRs allowed for CDCA licensees.

9

*Empower Cannot Evade Pennsylvania Law*

72. Empower may argue that its fees and tips do not qualify as interest because they are voluntary, but "[t]he payment of usurious interest is usually voluntary[.]" *Marr v. Marr*, 20 A. 592, 593 (Pa. 1885); *Stock v. Meek*, 221 P.2d 15, 20 (Cal. 1950) ("The theory of [a usury] law is that society benefits by the prohibition of loans at excessive interest rates, even though both parties are willing to negotiate them. Accordingly, 'voluntary' payments of interest do not waive the rights of the payors.")

73. Further, interest is defined as "compensation . . . for the use . . . of money." *Interest*, Black's Law Dictionary, p. 816 (7th ed. 1999).

74. Empower's fees and tips qualify as interest because they compensate Empower for the use of money.

75. Further, even if Empower's fees and tips do not qualify as interest, they still are prohibited because Pennsylvania law regulates any fee, charge, cost, or other amount charged, collected, contracted for, or received on a loan or advance of money or credit, or collected for the loan or use of money. 7 P.S. § 6203; 41 P.S. § 502.

76. Moreover, Pennsylvania law regulates fees, charges, and other amounts regardless of whether any fee, charge, or other amount is charged, collected, contracted for, or received on the amount loaned or advanced. *Dep't of Banking v. NCAS of Del., LLC*, 948 A.2d 752, 760-62 (Pa. 2008) (applying the CDCA to monthly membership fees); *Roethlein v. Portnoff Law Assocs., Ltd.*, 81 A.3d 816, 825 (Pa. 2013) (recognizing the LIPL provides cause of action for "costs . . . incurred in connection with the loan or use of money"); *see also Glover v. Udren Law Offices, P.C.*, 139 A.3d 195, 197 (Pa. 2016) (finding a consumer could bring action under the LIPL for "unearned and excessive attorney's fees").

10

77. Empower also may contend it can evade Pennsylvania law because its advances do not qualify as "loans," "advances," or "the loan or use of money."

78. These arguments should be rejected as well.

79. "Loan" is defined as a "thing lent for the borrower's temporary use." *Loan*, Black's Law Dictionary, p. 947 (7th ed. 1999).

80. "Advance" is defined as "money or goods furnished." *Advance*, Black's Law Dictionary, p. 53 (7th ed. 1999).

81. Because Empower's advances are money furnished, they are "advances."

82. And because Empower's cash advances are money lent for temporary use, they are "loans."

83. Empower is a for profit company that advances cash to borrowers fully expecting borrowers will repay the advance and fees in return for the privilege of obtaining the advance.

84. Indeed, Empower structured its business specifically to obtain repayment: before borrowers obtain advances, Empower evaluates its ability to obtain repayment by automatically withdrawing funds from bank accounts; borrowers must link their accounts and allow Empower to automatically withdraw funds to obtain repayment; and Empower issues only one advance at a time, and will not issue additional advances until prior advances are repaid.

85. Further, despite its advances being just as costly as (if not more costly than) payday loans, Empower obtains repayment of its advances at least 97% of the time, which significantly exceeds the rate at which other payday lenders receive payment.

86. Empower cannot evade Pennsylvania law by attempting to call its cash advances and its fees and tips something they are not. *Simpson v. Penn Disc. Corp.*, 5 A.2d 796, 798 (Pa. 1939) (citations and quotation marks omitted) ("The statute against usury forms a part of the public

policy of the state and cannot be evaded by any circumvention or waived by the debtor[.] It is immaterial in what form or pretence the usurious interest is covered in the contract[.] As usury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality, it is the duty of the court to examine the substance of the transaction as well as its form . . . [.] It is, indeed, wholly immaterial under what form or pretence usury is concealed, if it can by any means be discovered our courts will refuse to enforce its payment."); *see, e.g.*, *Walnut Disc. Co. v. Weiss*, 208 A.2d 26, 28 (Pa. Super. 1965); *Saunders v. Resnick*, 16 A.2d 676 (Pa. Super. 1940); *Moll v. Lafferty*, 153 A. 557, 558-59 (Pa. 1931); *see also Scott v. Lloyd*, 34 U.S. 418, 446-47 (1835) ("The ingenuity of lenders has devised many contrivances, by which, under forms sanctioned by law, the [usury] statute may be evaded. . . . Yet it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction."); *Pope v. Marshall*, 4 S.E. 116, 118 (Ga. 1887) ("The theory that a contract will be usurious or not according to the kind of paper-bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous."); *Carter v. Brand*, 1 N.C. 255, 257 (1800) ("Every case arising . . . to restrain excessive usury must be viewed in all its circumstances, so as to ascertain the real intention of the parties. If that be corrupt in the substance and design, no pretext however plausible, no contrivance however specious, no coloring however artful, with which the transaction is veiled, will secure it from the censure of the law."); *Taylor v. Salary Purchasing Co.*, 218 S.W. 2d 571, 573 (Mo. 1949) ("[R]espondent did not intend to donate . . . the . . . money which it advanced[.] . . . It intended to create the relation of debtor and creditor. It intended to collect the money so advanced and, whenever possible, it did collect the same with usurious interest.").

87. The Pennsylvania Legislature passed the LIPL and CDCA specifically to prevent Empower's scheme. *Smith v. Mitchell*, 616 A.2d 17, 20 (Pa. Super. 1992) (stating that the purpose of LIPL is "to protect the citizenry of this Commonwealth from being exploited at the hands of unscrupulous individuals seeking to circumvent the law at the expense of unsuspecting borrowers who may have no other avenue to secure financial backing").

*Facts Relevant to Plaintiffs*

88. Plaintiffs obtained cash advances from Empower, and used those cash advances for personal, family, and/or household purposes.

89. Plaintiffs paid Empower's express and monthly fees.

90. Plaintiffs also paid Empower's tips.

91. Plaintiffs did not know they were paying interest by paying these tips and fees.

92. Empower's tips and fees yielded double and triple-digit APRs.

93. Plaintiffs were unaware that the amounts they paid yielded double and triple-digit APRs, and Empower failed to disclose this fact.

## CLASS ACTION ALLEGATIONS

94. Plaintiffs bring this action individually and on behalf of those similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

95. Plaintiffs seek to certify the following class: "Every individual with a Pennsylvania address, who obtained an advance or loan from Defendant." Plaintiffs reserve the right to expand, narrow, or otherwise modify the class as the litigation continues and discovery proceeds.

96. Fed. R. Civ. P. 23(a)(1): The class is so numerous that joinder is impracticable. There are thousands of members of the class. The class is identifiable by the records of Defendant and Plaintiffs and the class members.

97. <u>Fed. R. Civ. P. 23(a)(2), (b)(3)</u>: Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over individual issues. For example, there is a single common answer to whether Defendant's advances qualify as "loans," "advances," or "credit" under the relevant laws, and whether the fees and tips Plaintiffs' paid qualify as "interest," "finance charges," or other amounts under the laws at issue. These common questions, and other common questions of law and fact, will predominate over individual questions, to the extent any individual questions exist.

98. <u>Fed. R. Civ. P. 23(a)(3)</u>: Plaintiffs' claims are typical of the claims of the members of the class because the claims of Plaintiffs and the class are based on the same legal theories and arise from the same conduct.

99. <u>Fed. R. Civ. P. 23(a)(4)</u>: Plaintiffs are adequate representatives of the class because the interests of Plaintiffs and the class align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class and have no interest antagonistic to the class. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

100. <u>Fed. R. Civ. P. 23(b)(3)</u>: Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiffs and the class members may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiffs and the class. Additionally, requiring Plaintiffs and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

## COUNT I
### Violation of the Loan Interest and Protection Law
### 41 P.S. §§ 101, et seq.

101. This claim is brought individually and on behalf of the class.

102. Plaintiffs and the class members are persons who paid a rate of interest in excess of that provided for by the LIPL and CDCA, and who paid charges prohibited or in excess of those allowed by the LIPL and CDCA.

103. Defendant collected from Plaintiffs and the class members interest in excess of that provided for by the LIPL and CDCA, and charges prohibited or in excess of those allowed by the LIPL and CDCA.

104. The LIPL provides for, among other things, damages, declaratory and injunctive relief, and attorneys' fees and costs. 41 P.S. §§ 501, 502, 503.

105. Accordingly, the Court should issue an order: awarding any excess interest, fees, or other charges collected by Defendant; awarding triple the amount of any excess interest, fees, or other charges collected by Defendant; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

## COUNT II
### Violation of the Consumer Discount Company Act
### 7 P.S. §§ 6201, *et seq.*

106. This claim is brought individually and on behalf of the class.

107. Defendant is in the business of negotiating, making, or arranging loans or advances, is not a bank, and is not licensed under any Pennsylvania statute.

108. Consequently, Defendant cannot charge, collect, contract for, or receive more than 6% combined interest, fees, or other charges on loans or cash advances issued in amounts under $25,000. 7 P.S. § 6203; 41 P.S. § 201(a).

109. Defendant, however, charged, collected, contracted for, or received interest, fees, or other charges above this amount.

110. Equitable relief is available to private parties under the CDCA. *Mellish v. CACH, LLC*, No. 19-cv-01217, 2020 U.S. Dist. LEXIS 52383, at *7 (W.D. Pa. Mar. 26, 2020) ("If a private civil litigant seeks enforcement of the CDCA, the available remedy is equitable[.]").

111. Accordingly, the Court should issue an order: awarding restitution in the amount of any interest, fees, or other amounts that Defendant charged, collected, contracted for, or received in excess of 6%; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

### COUNT III
### Violation of the Truth-In-Lending Act
### 15 U.S.C. §§ 1601, *et seq.*

112. This claim is brought individually and on behalf of the class.

113. Defendant is a "creditor," Plaintiffs' and the class members' cash advances are "consumer credit transactions," and Plaintiffs, Defendant, and the class members are "persons" within the meaning of TILA. 15 U.S.C. §§ 1602(e), (f), (g), (i).

114. TILA required Defendant to disclose the: "amount financed"; "finance charge"; and "annual percentage rate." *Id.* §§ 1638(a)(2), (3), (4), (5).

115. The purpose of these disclosure requirements is to ensure a meaningful disclosure of credit terms to protect consumers against unfair credit practices and to ensure consumers avoid the uninformed use of credit. *Id.* § 1601(a).

116. Defendant failed to disclose, among other things, the "amount financed," "finance charge," "annual percentage rate," "total of payments," and payment schedule to Plaintiffs and the class members.

117. Indeed, at no time before, during, or after Plaintiffs or any class member obtained a loan or advance did Defendant disclose any of the above terms.

118. Because Defendant failed to comply with TILA's requirements, Defendant is liable to Plaintiffs and the class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. *Id.* § 1640(a).

## COUNT IV
### Violation of the Electronic Funds Transfer Act
### 15 U.S.C. §§ 1693, *et seq.*

119. This claim is brought individually and on behalf of the class.

120. Plaintiffs and the class members are "consumers," Defendant's cash advances are "extensions of credit," the bank accounts Plaintiffs and the class members were required to link to Defendant's app are "accounts," and the withdraws Defendant made from the accounts of Plaintiffs and the members of the class are "preauthorized electronic fund transfers" within the meaning of the EFTA. 15 U.S.C. §§ 1693a(2), (6), (10).

121. Defendant violated the EFTA by conditioning its extension of credit on repayment by means of preauthorized transfers. *Id.* §§ 1693e(a), 1693k(1).

122. Because Defendant failed to comply with EFTA's requirements, Defendant is liable to Plaintiffs and the class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. *Id.* § 1693m(a).

## COUNT V
### Violation of the Unfair Trade Practices and Consumer Protection Law
### 73 P.S. §§ 201-1, *et seq*

123. This claim is brought individually and on behalf of the class.

124. Plaintiffs, the class members, and Defendant are persons, the advances at issue were used to buy goods or services for personal, family, and/or household use, and Defendant's conduct is trade or commerce under the UTPCPL. 73 P.S. §§ 201-2(2), (3), 201-9.2.

125. The conduct at issue in this case constitutes unfair methods of competition or unfair or deceptive acts or practices under the UTPCPL because Defendant: caused a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; caused a likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another; represented that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they did not have; and engaged in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding. *Id.* §§ 201-2(4)(ii), 201-2(4)(iii), 201-2(4)(v), 201-2(4)(xxi).

126. More specifically, Defendant's conduct is unfair or deceptive because, among other things, Defendant's fees and tips are sham interest, Defendant's cash advances are offered at an excessive rate of interest and fees, Defendant's advances have high costs, despite Defendant's claim that it makes no interest or 0% interest advances, Defendant is not a lawful lender offering lawful advances, despite Defendant's implications to the contrary, and Defendant cannot charge, collect, contract for, or receive the fees it charges, despite Defendant's implication to the contrary. *Pa. Dep't of Banking v. NCAS of Del., LLC*, 995 A.2d 422, 442-44 (Pa. Cmwlth. 2010) (finding claim for relief stated under UTPCPL where complaint alleged that a payday lender "offer[ed] a line of credit product . . . at an excessive rate of interest").

127. Defendant's use of unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce violates 73 P.S. § 201-3.

128. Plaintiffs and the class members lost money or property as a result of Defendant's violations and, therefore, are entitled to actual damages, statutory damages, treble damages, and all other available relief under 73 P.S. § 201-9.2, as well as reasonable costs and attorneys' fees, and such additional relief the Court deems necessary or proper.

## **JURY TRIAL DEMANDED**

Plaintiffs request a jury trial on all claims so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

a. An order certifying the proposed class, appointing Plaintiffs as representatives of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b. An order awarding actual, statutory, treble, and all other damages available by law, along with pre- and post-judgment interest;

c. An order providing Plaintiffs and the class members restitution for any interest, fees, or other charges that were paid to Defendant and that aggregated in excess of 6%;

d. An order awarding attorneys' fees and costs;

e. An order declaring Defendant's conduct unlawful; and

f. An order awarding all other relief that is just, equitable, and appropriate.

|  |  |
|---|---|
|  | Respectfully Submitted, |
| Dated: February 8, 2024 | By: */s/ Kevin Abramowicz* <br> Kevin Abramowicz <br> Kevin Tucker <br> Chandler Steiger <br> Stephanie Moore <br> **East End Trial Group LLC** <br> 6901 Lynn Way, Suite 215 <br> Pittsburgh, PA 15208 <br> Tel: (412) 223-5740 <br> Fax: (412) 626-7101 <br> kabramowicz@eastendtrialgroup.com <br> ktucker@eastendtrialgroup.com <br> csteiger@eastendtrialgroup.com <br> smoore@eastendtrialgroup.com <br><br> *Attorneys for Plaintiffs* |